IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| HARRIS FAMILY TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 110265N |
| | ) | |
| v. | ) | |
| | ) | |
| MARION COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the 2010-11 real market value of property identified as Account R25917 (subject property). A trial was held on October 12, 2011, in the Tax Courtroom, Salem, Oregon. W. Scott Phinney, Attorney at Law, appeared on behalf of Plaintiff. Danielle Navas (Navas), property manager for the subject property, and Rick Bean (Bean), commercial real estate broker, testified on behalf of Plaintiff. Scott Norris, Assistant County Counsel, appeared on behalf of Defendant. Tom Rohlfing (Rohlfing), Senior Commercial Appraiser, testified on behalf of Defendant. Plaintiff's Exhibit 1 and Rebuttal Exhibits 2, 3, and 4 were offered and received without objection. Plaintiff objected to Defendant's Exhibit A, arguing that Rohlfing is not qualified to give expert testimony. The court admitted Defendant's Exhibit A over Plaintiff's objection, finding that Rohlfing, a registered appraiser, was qualified to testify as an expert.

I. STATEMENT OF FACTS

The subject property is the Cascade View Apartments, built in 1994, located in northeast Salem, Oregon. (*See* Ptf's Ex 1 at 2; Def's Ex A at 3.) Navas testified that the subject property includes 126 units in 16 buildings, all of which are two-bedroom, one-bathroom units,[1] ranging

---

[1] Plaintiff provided a printout from the website ForRent.com stating that the subject property includes one-bedroom units. (Ptf's Ex 1 at 31-32.) Navas testified that that is false advertising; the subject property includes no one-bedroom units. Rohlfing testified that Navas told him that she sometimes rents two-bedroom units as one-bedroom units by "locking off" the larger bedroom; rent is $25 per month less for "effective" one-bedroom units.

in size from 820 to 840 rentable square feet per unit. (*See* Ptf's Ex 1 at 4-8.) She testified that there are two different floor plans, A and B, one of which has a very small bathroom. Navas testified that the "downstairs" units have washer and dryer hookups, but the "upstairs" units do not; the subject property includes a common laundry room. She testified that the unit interiors are "as old as the apartments." Navas testified that the units include original appliances and "light pink" countertops. She testified that the subject property includes covered parking (one spot per unit), but no garages; there is limited additional parking. Navas testified that the subject property does not include a swimming pool or clubhouse, which is a detriment to achieving higher rents.

Navas testified that the subject property siding was replaced in 2008 and 2009, but the work quality was poor. (*See* Ptf's Ex 1 at 29-30 (construction log for siding repairs).) She testified that two buildings were not re-sided and need repairs due to dry-rot. Navas testified that the subject property roofs "all need to be replaced."

Navas testified that the subject property is situated on eight acres and is "right on I-5."[2] (*See* Ptf's Ex 1 at 4, 8.) She testified that the proximity to I-5 is a detriment because of the noise; there is no sound barrier between the subject property and the freeway. Navas testified that the subject property is also located near Chemeketa Community College. She testified that the subject property neighborhood is "not the nicest." Navas testified that, during the summer of 2010, the subject property suffered from numerous car break-ins and thefts; some tenants left as a result. She testified that, as of the trial date, a security company provided night patrol at the subject property. Navas testified that there used to be a bus stop in front of the subject property,

/ / /

---

[2] Navas testified that, from the subject property, the driving distance to the I-5 on-ramp is about one mile.

but the bus changed routes in April or May 2010, and no longer picks up in front of the subject property. She testified that the nearest grocery store is about one and one-half miles away.

Navas testified that she began as property manager at the subject property in early 2010; previously, she worked at Lancaster Commons, an apartment complex about one and one-half miles from the subject property that includes a swimming pool, a clubhouse, and a basketball court. She testified that 101 of the 126 subject property units were occupied as of February 2010. (*See* Ptf's Ex 1 at 22-28.) Navas testified that as of July 2010, only six of the subject property units were vacant. She testified that, as of March 2010, the subject property rent was $550 per month for an upstairs unit and $595 for a downstairs unit. Navas testified that rent concessions offered at that time included two months of free rent for new 14-month leases and one month of free rent to existing tenants for lease renewals. She testified that competitors offered promotions including free rent, free gym memberships, free pizza every night for a period of time, and waiver of screening fees. Navas testified that the subject property rents increased in June 2011 and vacancy increased as a result.

Navas testified that she talks with other apartment managers about problems affecting properties in the area of the subject property. She testified that she also "shops competitors" and researches the market. Navas testified that Willamette Estates is located near the subject property; the units are "very expensive" and "gorgeous," with interiors that look "brand new." Navas testified that another property located near the subject property, Columbia Village, is similar to the subject property except that Columbia Village has vaulted ceilings and superior closets. She testified that Columbia Village filled up more quickly than the subject property in 2010 and, as of the date of trial, had reduced rents to the $550 to $595 range. Navas testified that another apartment complex located near the subject property offers rents from $530 to $550. She

testified that Keizer, South Salem, and West Salem are more desirable locations than the subject property location.

Bean testified that the subject property quality is class "B-/C+," which is "sub-par." Rohlfing testified that the subject property exterior condition is "above average" with the exception of the two buildings that were not re-sided; the interior condition is average. (*See* Def's Ex A at 3.) He testified that he inspected the subject property during "summer 2011" and found it to be well-maintained. Rohlfing testified that, during his inspection, he spoke with Navas, looked at a vacant unit, walked the entire property, and spoke with a maintenance person who was fixing the siding on one of the two buildings that had not been re-sided.

A.      *Market conditions*

Bean testified that 2006 through 2008 were the "golden years of multi-family" properties. He testified that the market slowed down in 2008; financing disappeared, fewer sales occurred, prices dropped, and capitalization rates increased. (*See, e.g.,* Ptf's Ex 1 at 58-61 (January 9, 2009, article describing the "coming commercial crash").) Rohlfing testified that, according to a Wall Street Journal article from September 22, 2010, the multi-family market had improved from the previous year. (*See* Def's Ex A at 32-33.)

B.      *Income approach*

Both Bean and Rohlfing testified that they placed the most weight on the direct capitalization approach. Bean testified that he used the 2007 through 2010 rental information provided by Plaintiff to determine gross income, expenses, and net operating income. (*See* Ptf's Ex 1 at 10.) Bean testified that, for each year 2007 through 2010, he identified "rental income" and "other income"; he did not include "laundry coin" income because that income is attributable to personal property. (*See id.*) He testified that he excluded mortgage payments, mortgage

interest, and property taxes from his calculation of net operating income for each year. (*See id.*) Bean determined rental income of $782,875 in 2007, $776,223 in 2008, $655,805 in 2009, and $724,812 in 2010. (*Id.*) He determined "other income" of $17,200 in 2007, $18,705 in 2008, $15,557 in 2009, and $16,371 in 2010. (*Id.*) Bean used actual expenses to determine net operating income, but also identified the expense ratio and expense per unit as 42.39 percent and $2,691 per unit in 2007; 44.38 percent and $2,800 per unit in 2008; 43.98 percent and $2,343 per unit in 2009; and 47.59 percent and $2,799 per unit in 2010. (*Id.*) Bean calculated net operating income of $460,951 in 2007, $442,125 in 2008, $376,095 in 2009, and $388,490 in 2010. (*Id.*)

Bean testified that he considered capitalization rates reported by a variety of sources and found that reported capitalization rates ranged from 6.75 to 9.4 percent. (*See, e.g.,* Ptf's Ex 1 at 75.) He considered the following especially relevant for the subject property: Norris & Stevens reported 7.0 to 8.3 percent for properties with 20 or more units built after 1990 in Marion County in "Fall/Winter 2009/2010"; Realty Rates reported 8.6 percent for properties built after 1990 in "Portland-Salem" during the first quarter of 2010; Real Capital Analytics reported 9.4 percent for properties in Clackamas, Marion, and Yamhill counties in 2009; and a 20-unit property located on Front Street NE in Salem sold at a capitalization rate of 8.15 percent on "4/19/2010." (*Id.* at 39.) Rohlfing testified that he disagrees that the Front Street NE property identified by Bean is comparable to the subject property. Bean testified that he selected a capitalization rate of 7.50 percent but, after reflection, thought that rate was a bit low. He testified that he added a tax rate of 1.40 percent for an overall rate of 8.90 percent. (*See id.* at 10.) Using the overall rate of 8.90 percent, Bean calculated a "value" for the subject property for each year 2007 through 2010: $5,179,225 in 2007, $4,967,697 in 2008, $4,225,787 in 2009, and

/ / /

$4,365,056 in 2010. (*Id.*) He determined an indicated value of $5,150,000 for the 2010-11 tax year. (*Id.*)

Bean testified that he compared the subject property's actual income and expenses to market data. (*See* Ptf's Ex 1 at 55.) He testified that he does not consider the subject property to be "underperforming"; it has "excellent" management. Bean testified that the operation and performance of the subject property are similar to other properties in northeast Salem. He testified that the Metro Multifamily Housing Association Apartment Report Spring 2010 expense survey included 156 properties with "[o]verall expenses per unit rang[ing] from $3,221 for older garden style units in Clark County, up to $4,175 for older garden style in Washington County." (*Id.*) Bean testified that he does not know whether property taxes were included in expenses for purposes of the survey, but assumes that they were.

Rohlfing testified that he identified as rent comparables four properties similar in age to the subject property. (*See* Def's Ex A at 13.) He testified that he has visited each of the four rent comparables and has interviewed the property managers. The four rent comparables identified by Rohlfing have 30, 58, 40, and 42 units, respectively. (*Id.*) Effective gross income for each of those properties was $238,830, $432,896, $299,423, and $324,395, respectively. (*Id.*) Rohlfing testified that, at the time of his report, he thought $625 per month was reasonable rent for the subject property; at trial, he testified that $600 per month is more reasonable. (*See* Def's Ex A at 14, 26.) Rohlfing testified that he determined $5,000 of "other income," a figure lower than the subject property actual income. (*Id.* at 14.) Based on his revised monthly rent, Rohlfing determined potential gross income $912,200.

Rohlfing testified on cross-examination that the asking rent for the subject property at January 2011 was in the range of $550 to $650 per month and he thinks that was comparable to

January 2010.  (*See also* Def's Ex A at 28 (fourth quarter 2009 Powell Valuation survey stating that rent was $562 per month for two-bedroom, one-bathroom East Salem units built after 1990 with no amenities).)  He testified that the subject property was underperforming prior to January 2010.  Rohlfing testified in support of the conclusion that the subject property's vacancy rate of 26 percent was much higher than market vacancy, noting other reported vacancy rates: 5.24 percent for apartments in East Salem constructed after 1990 according to the fourth quarter 2009 Powell Valuation Survey and 5.6 percent for "Salem Vicinity/Newer" according to Norris & Stevens.  (Def's Ex A at 28, 34.)

The expenses, as a percentage of effective gross income, reported by Rohlfing's four rent comparables were 36 percent, 40.5 percent, 42.9 percent, and 44.7 percent, respectively.  (Def's Ex A at 13.)  Rohlfing testified that, based on the range of expenses reported in his survey, he determined an expense ratio of 38 percent for the subject property.  (*See id.* at 14.)  He testified that he considered 38 percent reasonable for the subject property because it is well-maintained and because costs are spread out over more units; with more units, there are cost savings in expenses.  The expenses for Rohlfing's rent comparables ranged from $2,867 to $3,452 per unit; the 38 percent expense ratio for the subject property computes to $2,664 per unit.  (*Id.* at 13.)

Rohlfing testified that he used vacancy and credit loss of seven percent because that is what was typical for the market.  He testified that, according to Powell Valuation's Salem/Keizer Apartment Survey Fourth Quarter 2009, the highest vacancy amongst apartments built after 1990 were in Keizer, with a vacancy rate of 7.54 percent.  (*See* Def's Ex A at 28.)  He testified that the Norris & Stevens Fall/Winter 2009 Rent Survey reported 5.6 percent vacancy for "newer" apartment properties in the Salem Vicinity.  (*See id.* at 34.)  Rohlfing testified that he selected a capitalization rate of seven percent based on the reported capitalization rates for his comparable

sales, which ranged from 5.74 to 7.29 percent.[3]  (*See id.* at 11, 14.)  He testified that he added a tax rate of 1.85 percent for an overall rate of 8.85 percent.  (*See id.* at 14.)  Rohlfing testified that the Powell Valuation Salem/Keizer Apartment Survey Fourth Quarter 2009 reported a capitalization rate of 6.8 percent for apartment properties built after 1990.  (*See id.* at 30.)

Rohlfing testified on cross-examination that he used the fourth quarter 2009 Powell Valuation report because that was what was available to him; he conceded that the first quarter 2010 report is based on the pertinent fourth quarter 2009 data.  Plaintiff provided as a rebuttal exhibit the first quarter 2010 Powell Valuation Survey and the Norris & Stevens Fall/Winter 2009 Rent Survey.  (Ptf's Ex 2, 3.)  The first quarter 2010 Powell Valuation survey reports rent of $561 per month for two-bedroom, one-bathroom units built after 1990 located in East Salem with no amenities; vacancy of 5.68 percent for properties built after 1990 in East Salem and vacancy of 5.99 percent for Salem, overall; and capitalization rates of 8.05 percent for Salem/Keizer.  (Ptf's Ex 2 at 1, 3.)  The Norris & Stevens Fall/Winter 2009 Rent Survey reports an asking rent[4] of $593 per month for two-bedroom, one-bathroom units built before 1995 in the "Salem Vicinity" and four percent vacancy. (Ptf's Ex 3 at 2.)  At the time of his report, Rohlfing determined a value of $6,189,492 under the income approach.  (Def's Ex A at 14.)  At trial, he revised his value under the income approach to $5,792,271, using rent of $600 per month.

C.    *Sales comparison approach*

Bean testified that he found limited sales of comparable properties located in the same geographic region as the subject property that occurred following the "crash" in late 2008.  He

---

[3] Rohlfing testified that, although the rates are identified as overall rates in his sales comparison approach, they do not include tax rates.  (*See* Def's Ex A at 11.)

[4] The Norris & Stevens Fall/Winter 2009 Rent Survey states that "[r]ents shown below are an average of the stated asking rents, and do not reflect the impact of specials and concessions on rental income.  Specials and concessions are also not factored into the vacancy rates, therefore, financial occupancy may be significantly lower than physical occupancy."  (Ptf's Ex 3 at 1.)

testified that he would not use a 2008, "pre-crash" sale because it would not reflect the market conditions as of January 1, 2010. Bean testified that he identified sales of properties in 2009 and 2010 using "CoStar," "LoopNet," "RMLS," and a conversation with a local realtor, Brian Miller. (*See* Ptf's Ex 1 at 65.) The sales identified by Bean involve properties ranging from 8 to 224 units, with prices per unit ranging from $39,316 per unit for a 117-unit property built in 1971 that sold July 15, 2009, to $56,250 per unit for a 12-unit property built in 1991 that sold September 23, 2009. (*Id.*) Bean testified that, of the 11 comparable sales he identified, he visited the properties at Hyacinth Street NE, Kacey Circle, and Front Street NE. (*See id.*) He testified that the properties built in the 1960s and 1970s and the properties with less than 20 units are not necessarily comparable to the subject property, but he considered them because it was hard to find good data. Bean testified that the price per unit is typically higher for small properties. He testified that he determined a value of $45,000 per unit, for an indicated value of $5,670,000, rounded, for the subject property. (*See* Ptf's Ex 1 at 2.)

Rohlfing testified that he does not consider Bean's sales to be comparable to the subject property, noting that 7 out of 11 sales have fewer than 20 units and several of the properties were built in the 1960s and 1970s. (*See* Ptf's Ex 1 at 65.) Rohlfing testified with respect to his other concerns about Bean's sales, noting that the property on Kacey Circle is low-income housing, that the property on Plymouth Drive NE is located in an inferior neighborhood, and that he could not find a record of the 2009 sale of the Hyacinth Street NE property. (*See id.*)

Rohlfing identified five comparable properties that were sold in 2008 and 2009. (Def's Ex A at 11-13.) He determined a value range of $62,219 to $71,744 per unit and concluded a value of $62,500 per unit for the subject property, for an indicated value of $7,875,000. (*Id.*) Sale 1 involved the Shoreline Point apartments, a 24-unit complex built in 1996 that sold for

$65,000 per unit on July 1, 2008; Rohlfing made no adjustments to the sale price of $65,000 per unit. (*Id.* at 11.) Sale 2 involved the Overlook Point apartments, a 98-unit complex built in 1996 that sold for $82,959 per unit on November 12, 2008; the adjusted sale price is $62,219. (*Id.*) Sale 3 involved the Lancaster Commons apartments, a 280-unit complex built in 1992 that sold for $66,429 per unit on December 1, 2008; the adjusted sale price is $63,108. (*Id.*) Sale 4 involved the Plymouth Manor apartments, an 18-unit complex built in 1996 that sold for $65,222 per unit on January 17, 2009; the adjusted sale price is $71,744. (*Id.*) Sale 5 involved the McNary Apartments, a 20-unit complex built in 2009 that sold for $74,500 per unit on November 4, 2009; the adjusted sale price is $67,050. (*Id.*) Average room rent ranges from $575 to $767 per month. (*Id.*)

Rohlfing testified on cross-examination that he did not verify each of his comparable sales, but he has visited all of them. He testified that sale 1 is located in Keizer, sale 2 in South Salem, sale 3 very near the subject property on Lancaster NE, sale 4 in Keizer on the border with Salem, and sale 5 in Keizer. (*See* Def's Ex A at 11.) Rohlfing testified that the Salem and Keizer markets are very similar. He testified that the sale 4 neighborhood is worse than the subject property neighborhood, so he made a 10 percent downward location adjustment. (*See id.*) Rohlfing testified that he made a 5 percent downward adjustment for amenities to sale 3, Lancaster Commons, noting that additional amenities are also an additional expense. (*See id.*) He did not make any adjustments for the time of sale. Plaintiff provided as a rebuttal exhibit "Salem Apartment Sales Over Time," to demonstrate that some adjustment for time is necessary. (Ptf's Ex 4.) Rohlfing testified that Plaintiff's Rebuttal Exhibit 4 does not provide sufficient information to determine an appropriate time adjustment.

/ / /

D.    *Cost approach*

Bean testified that he did not use the cost approach because of the age of the subject property.  Rohlfing testified that he determined value under the cost approach, but did not place much weight on that approach because of the age of the subject property.  Rohlfing identified four land sales that occurred between March 20, 2008, and September 8, 2008, involving properties ranging in size from 1.82 to 7 acres.  (*See* Def's Ex A at 8-9.)  The land sales prices ranged from $5.11 per square foot to $8.68 per square foot.  (*Id.* at 9.)  Rohlfing determined a land value of $6.50 per square foot for a land value of $1,863,390.  (*Id.* at 8.)  Using Marshall & Swift Valuation Services, he determined a depreciated replacement cost for the improvements to be $7,941,200, for a total value under the cost approach of $9,804,590.  (*Id.* at 10.)

The 2010-11 roll real market value of the subject property is $7,900,220.  The 2010-11 maximum assessed value is $5,625,040.  Plaintiff requests a 2010-11 real market value of no more than $5,300,000.  In his report, Rohfling determined a 2010-11 real market value of $6,500,000.  (Def's Ex A at 1.)  At trial, Rohlfing revised his value under the income approach to $5,792,271; it is not clear whether Defendant revised its requested value based on its revised income approach.

## II.  ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year.  "Real market value is the standard used throughout the ad valorem statutes except for special assessments."  *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).  Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash
> that could reasonably be expected to be paid by an informed buyer to an informed

seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[5]

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2); OAR 150-308.205-(A)(2)(a). There are three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept of Rev.* (*Allen*), 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a). The method of valuation to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533 (1979). Both parties placed the most weight on the income approach. Plaintiff presented sales evidence. Defendant determined a value under the sales comparison approach and placed some weight on that approach. Defendant determined a value under the cost approach, but did not give it any weight. The court agrees that

_____

[5] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

the income approach should be given the most weight in this analysis. Given the age of the subject property, the court also agrees that no weight should be given to the cost approach.

A.      *Income approach*

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citations omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income." *Id.* "[Net operating income] is the currently expected net income of a property after all operating expenses are deducted from gross income. To calculate the [net operating income], appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* at 254, citing Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001). "A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen*, 17 OTR at 260.

Both parties considered the subject property's actual income as well as market data. Navas testified that the subject property rents as of March 2010 were $550 per month for the downstairs units and $595 per month for upstairs units, not including rent concessions offered at that time. According to Navas, other apartments near the subject property were asking for rents in the range of $530 to $595 per month and offering similar rent concessions. Market surveys provided by the parties indicated rents in the range of $560 to $595 for similar properties in Salem and Keizer. Based on the evidence presented, the subject property rents were typical of the market. The court finds that reasonable market rent for the subject property as of January 1, 2010, was $575 per month. Based on the subject property's "other income" reported by Bean for

2007 through 2010, the court finds that "other income" of $17,000 was reasonable for the subject property as of January 1, 2010, for potential gross income of $886,400.

The subject property actual vacancy rate as of early 2010 was considerably higher than the market reports for the Salem/Keizer apartment market. Based on the market data presented by the parties, the court finds that Rohlfing's vacancy rate of seven percent is reasonable as of January 1, 2010. According to Bean's report, the subject property actual expenses ranged from 42.39 percent to 47.59 percent. (Ptf's Ex 1 at 10.) Rohlfing's rent comparables indicated expense ratios ranging from 36 percent to 44.7 percent. (Def's Ex A at 13.) The court finds that a 42 percent expense ratio was reasonable for the subject property as of January 1, 2010, for net operating income of $478,000, rounded. Bean identified capitalization rates ranging from 6.75 to 9.4 percent based on market surveys and one sale in Salem. (Ptf's Ex 1 at 39.) He selected a capitalization rate of 7.50 percent to which he added a tax rate of 1.40 percent for an overall rate of 8.90 percent. (*Id.* at 10.) Rohlfing identified capitalization rates ranging from 5.74 to 7.29 percent, to which he added a tax rate of 1.85 percent for an overall rate of 8.85 percent. (Def's Ex A at 39.) The court finds that the overall rate of 8.85 percent used by Rohlfing is supported by the evidence presented by the parties. The court finds that the indicated value of the subject property under the income approach as of January 1, 2010, was approximately $5.4 million.

B.      *Sales comparison approach*

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

OAR 150-308.205-(A)(2)(c). "The court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson*, WL 21263620 at *3.

Bean identified sales of apartment properties in Salem and Keizer in 2009 and 2010.  The comparability of Bean's sales to the subject property is questionable, given the number of units and ages of some of the properties.  Furthermore, the sales identified by Bean are not "adjusted to be comparable" to the subject property.  Rohlfing determined a price of $62,500 per unit for the subject property under the sales comparison approach, for a value of $7,875,000.  He made adjustments to his sales for differences, including location and amenities.  However, he did not make adjustments for time or number of units.  Given that three of the five sales identified occurred in 2008, and one in January 2009, the lack of adjustments for time likely have the effect of overstating Rohlfing's value conclusion under the sales comparison approach.  The court also notes that all but one of the comparable sales identified by Rohlfing commanded higher average rent than the subject property.  The court gives no weight to Plaintiff's sales evidence and little weight to Defendant's value conclusion under the sales comparison approach.

### III.  CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the 2010-11 real market value of the subject property was $5.4 million.  Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R25917 was $5.4 million for the 2010-11 tax year.

Dated this ____ day of February 2012.

ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on February 23, 2012.  The Court filed and entered this document on February 23, 2012.*